**CLASSIFIED EMPLOYEES ASSOCIATION,
Appellant,**

v.

**MATANUSKA–SUSITNA    BOROUGH SCHOOL DISTRICT, Matanuskasusitna School Board, and Chief School Administrator Robert Doyle, Appellees.**

**No. S–12606.**

Supreme Court of Alaska.

April 3, 2009.

---

Helene M. Antel, Palmer, for Appellant.

David M. Freeman, Scott M. Kendall, Holmes Weddle & Barcott, P.C., Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

The Matanuska–Susitna Borough School District decided to provide custodial services for its schools through an independent contractor rather than by employing custodial workers. The main question in this case is whether the District's outsourcing decision is arbitrable under its collective bargaining agreement with the Classified Employees Union. We conclude that it is not, primarily because no reasonable argument has been made that outsourcing is prohibited under the agreement. We therefore affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. The Parties and the Collective Bargaining Agreement

The Classified Employees Association (CEA) is a union that represents between six hundred and seven hundred employees in the Matanuska–Susitna Borough School District (District) "in a broad range of clerical, ad-

ministrative, maintenance, special education, and computer services positions." The CEA and the District are parties to a collective bargaining agreement (CBA) that defines the terms and conditions of employment applicable to the CEA's members. The agreement at issue was in effect from July 1, 2005, to June 30, 2008. In the first article of the agreement, the CEA and the District state their aim as "promot[ing] harmonious and cooperative relations between the employer and the employees." The agreement also attempts to "provide a basis for the adjustment of matters of mutual interest covered by this agreement by means of amicable discussion."

Article XI of the agreement outlines the procedures for dealing with grievances made by employees. A grievance is defined as

a claim by an employee based upon an event or condition which affects the conditions or circumstances under which an employee works caused by misinterpretation or inequitable application of District policies or procedures on personnel matters directly pertaining to these conditions or circumstances, and/or the terms of this Agreement and amendments thereof.

Article XI sets out the stages in the grievance process. The fourth and final stage of the process allows for the parties to "submit the issue to arbitration" if the issue has not been resolved by the grievant's department director or administrator, the superintendent, or by mediation. Under the terms of Article XI the decision of the arbitrator "shall be final and binding upon both parties." The arbitrator "can add nothing to, nor subtract anything from the Agreement between the parties or any policy of the School Board."

Article XIII, the "Savings Clause," indicates that the "Labor Agreement contains the full and complete agreement between the parties on all subjects upon which the parties did bargain or could have bargained." The article continues that the "Agreement terminates all prior agreements and understandings" made between the parties. The agreement contains no clause describing specific powers that are reserved to management.

## B. Bargaining History

In 1993 the District attempted to add a provision to the collective bargaining agreement which stated that "[t]he parties expressly agree that nothing in this Agreement shall be construed as prohibiting the District from contracting with independent contractors for activity drivers." The CEA did not agree to this language and the clause was not included in the contract; however, the CEA consented to a change to the 1993 agreement that allowed for outsourcing bus drivers if "an activity bus driver resigns, transfers, or takes a long term leave of absence."

The 2005–2008 agreement does not have any provision dealing with the outsourcing of activity drivers (or any specific provisions for outsourcing) because, according to the CEA, "the outsourcing of activity bus drivers was not successful." But apparently the question of outsourcing was a much-discussed subject during the negotiations for the 2005–2008 agreement. Robert Johnson, who was a member of the District's bargaining team and the school board in 2004, stated that "[o]utsourcing was [a] ... key issue[ ]" for both the District and the CEA in the negotiations. He said that the District "wanted to be able to outsource" CEA work in the new agreement but the "CEA members didn't want to change the way things had been done in the past" and "asked for the District's assurances that bargaining unit work would not be outsourced." Johnson claimed that the District gave assurances that work would not be outsourced,[1] although "[t]he parties did not come up with contract language to commemorate their agreement."

## C. The District's Decision To Outsource and Initial Court Proceedings

In December 2005 the District advertised that it would "consider proposals for Custodial Services and Light Duty School maintenance for specified facilities within the School District." NANA Management Services submitted a proposal, and the District entered into a contract with NANA. In March 2006

---

1. The District disputes this assertion.

the CEA filed a grievance against the District under the CBA. CEA specified that the "nature of the grievance" was that "[t]he proposed contracting-out of bargaining unit work constitutes a violation of the parties['] written and express verbal agreement on the subject." It also alleged that "the District has violated its duty to negotiate on mandatory subjects in good faith." Although the Matanuska–Susitna School Board debated a motion to terminate the contract with NANA, the motion failed. The District then went ahead with the contract, replacing its custodial workers with contract employees from NANA.

The parties, in anticipation of future arbitration, selected an arbitrator and set a hearing date of October 25, 2006. But before the CEA's claim reached arbitration, the District withdrew from the grievance process, claiming "the grievance issues [were] non-arbitrable" and stating its intention to take the matter to superior court for a declaratory judgment that outsourcing was not arbitrable.

In response, the CEA filed suit to force the District to participate in the grievance proceeding, including "the arbitration hearing ... scheduled for October 25, 2006." The CEA also alleged that state law, AS 14.14.060(f), prohibits the outsourcing of school district custodial work and sought a declaratory judgment to that effect. The District denied the CEA's allegations and counterclaimed, asking for "[a]n order declaring as a matter of law that the grievance is based on a managerial decision that is not a matter for arbitration under the CBA." The District later moved for declaratory judgment: in its memorandum in support of declaratory judgment, it argued that the CBA did not include an agreement to arbitrate decisions related to outsourcing and that such decisions were not a matter of mandatory bargaining under Alaska law. In its opposition to the District's motion and cross-motion for declaratory judgment, the CEA stressed "[t]he presumption in favor of arbitration" that has been "cited with favor by the Alaska Supreme Court on numerous occasions." It argued that the grievance clause of the collective bargaining agreement should

be interpreted to encompass the decision by the District to outsource custodial services. There were further replies and responses by each party.

On October 24, 2006, Superior Court Judge Beverly W. Cutler decided in favor of the District as a matter of law, treating the parties' filings as motions for summary judgment because the parties had "stipulated that there are no genuine issues of material fact in dispute." The court also concluded that AS 14.14.060(f) does not prohibit the school board from privatizing its custodial services. Accordingly, the superior court declined to grant the declaration sought by the CEA.

### D. The Superior Court's Decision and the Motion To Reconsider

The superior court's memorandum of decision did "not attempt to address each and every point raised" in the parties' briefing. After ruling that the question of arbitrability was a question for the courts to resolve, the superior court declared it was "persuaded by the District's reasoning." The court said that the grievance clause of the CBA left "no doubt" that it "was not intended to apply to disputes over decisions to privatize the custodial workforce." The court in particular found it implausible that the decision to outsource could be considered a dispute about the conditions under which employees work. The court stated that "[t]he plain language of the clause indicates that the parties designed it to address grievances by employees related to unfair treatment by the District relating to the wages, hours and conditions of employment." It concluded that the CEA's interpretation of the contract was "overbroad" and found the power to outsource was "within the District's overarching power to manage the economical well-being of the borough's school system." Accordingly, the superior court granted the District's request to vacate the scheduled October 26 arbitration.

The CEA filed a motion to reconsider, arguing that the court failed to give weight to the presumption in favor of arbitrability, that it too narrowly interpreted the CBA, and that it ignored the bargaining history

between the parties. The superior court denied the motion for reconsideration.

The CEA appeals.

## III. STANDARD OF REVIEW

The question of whether an issue is arbitrable is a question of law subject to de novo review.[2] We adopt the rule of law that is "most persuasive in light of precedent, reason, and policy."[3] We will affirm a lower court's grant of summary judgment if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.[4] We draw all reasonable inferences in favor of the non-moving party.[5]

## IV. DISCUSSION

### A. The Superior Court's Grant of Summary Judgment

In its Memorandum of Decision on Cross–Motions for Summary Judgment, the superior court wrote that "[t]he parties have stipulated that there are no genuine issues of material fact in dispute" and that "after careful consideration it appears that the District is entitled to judgment as a matter of law." We have been unable to find a stipulation in the record to the effect that there are no genuine issues of material fact.[6] The superior court, however, in its Order Denying Reconsideration, stated that "[t]he court notes that the parties stipulated there were no genuine issues of material fact by filing their respective motions for summary judgment."

If the superior court assumed that there were no genuine issues of material fact because both parties filed "respective motions for summary judgment," this assumption was not necessarily correct. Each movant could believe that if the law it advocated were accepted there would be no issues of material fact standing in the way of a favorable judgment. At the same time, each could believe that if the law were not as it advocated, the

opponent would not be entitled to summary judgment because of the existence of material facts. Although the CEA does not explicitly make this point, it asserts that there are facts (especially those relating to bargaining history) that it believes the court should have considered in its ruling. The District, in its brief, disputes the significance and weight that should be accorded to the facts which the CEA cites.

The superior court also remarked in its reconsideration order that "there are no genuine issues of material fact with regard to the purely legal question of whether the grievance clause of the parties' CBA contemplates a dispute over outsourcing." This statement provides a surer ground for the court's grant of summary judgment. In this opinion we too deal solely with the "purely legal question" of whether the District's decision to outsource is arbitrable as a matter of law.

### B. The Presumption in Favor of Arbitrability

The CEA stresses the presumption in favor of arbitrability in its briefs. The CEA writes that this presumption means that the "burden of proof is on the party seeking to avoid arbitration" and that the superior court erred in not resolving its doubts about whether the issue was arbitrable in favor of arbitration. However, the District replies that the CEA has misread the presumption: it is not merely a blanket presumption in favor of arbitration come what may, but a presumption that only applies when the contract that provides for arbitration is ambiguous. The District avers that the contract in question in this case leaves no doubt that outsourcing is not a matter for arbitration.

We have ruled that there is a presumption in favor of arbitrability. In *Uni-*

---

**2.** *Lexington Mktg. Group v. Goldbelt Eagle, LLC,* 157 P.3d 470, 472 (Alaska 2007).

**3.** *Id.* (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**4.** *Id.* (quoting *Alakayak v. British Columbia Packers, Ltd.,* 48 P.3d 432, 447 (Alaska 2002)).

**5.** *Id.* (quoting *Alakayak,* 48 P.3d at 447).

**6.** The District alludes to a stipulation in its brief, but provides no citation to the record.

*versity of Alaska v. Modern Construction, Inc.*, we noted that the common law and statutes of Alaska evince "a strong public policy in favor of arbitration."[7] In the same case, we observed that this presumption represented a change from an earlier attitude that "was mainly hostile [to arbitration] until a change in judicial philosophy and the advent of commercial arbitration statutes combined to change public policy on the desirability of arbitration."[8] As a result of the shift in policy, we held in *Modern Construction* that ambiguous contract terms should "be construed in favor of arbitrability where such construction is not obviously contrary to the parties' intent."[9] We have also endorsed the United States Supreme Court's standard that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the dispute. Doubts should be resolved in favor of coverage."[10] As we summed up the presumption in *Ahtna, Inc. v. Ebasco Constructors, Inc.*, "[a]ny ambiguity with regard to arbitrability is to be construed in favor of arbitration."[11]

But the presumption in favor of arbitration is limited. Arbitration is a creature of contract, and if there are terms in a contract that either exclude arbitration or indicate that an issue should not be subject to arbitration, then requiring that the matter be sent to arbitration would be inappropriate. As this court put it in *Lexington Marketing Group v. Goldbelt Eagle, LLC,* "[b]ecause arbitration is a matter of contract, parties can only be compelled to arbitrate a matter where they have agreed to do so."[12] Accordingly, if a dispute is not, under a plausible interpretation, covered under the arbitration clause of a collective bargaining agreement, it should not be arbitrated because "a party cannot be required to submit to arbitration any dispute which he had not agreed so to submit."[13]

As this discussion implies, arbitrability is a threshold question for the court, not the arbitrator.[14] One reason for this division of authority is "[b]ecause arbitrators have such broad discretion, it is often problematic for them to decide their own jurisdiction, for if they are wrong, there may be essentially no review. This is so because the superior court reviews an arbitrator's decision under a standard giving extreme deference to the arbitrator."[15] A court should determine that a claim is arbitrable, if, as stated above, a plausible or reasonably arguable case for arbitrability has been made. Conversely, if there are no plausible or reasonably arguable grounds supporting arbitrability, it is the duty of a court to decline to order arbitration.

**7.** 522 P.2d 1132, 1138 (Alaska 1974) (citation omitted); *accord Dep't of Pub. Safety v. Pub. Safety Employees Ass'n,* 732 P.2d 1090, 1093 (Alaska 1987) (common law and statutes of Alaska support presumption in favor of arbitration).

**8.** *Modern Construction,* 522 P.2d at 1138 n. 19 (collecting earlier cases and scholarly articles).

**9.** *Id.* at 1138; *accord Lexington Mktg.,* 157 P.3d at 476.

**10.** *Ahtna, Inc. v. Ebasco Constructors, Inc.,* 894 P.2d 657, 662 n. 7 (Alaska 1995) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

**11.** 894 P.2d at 662.

**12.** 157 P.3d 470, 477 (Alaska 2007) (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475

U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)).

**13.** *AT & T Techs.,* 475 U.S. at 648, 106 S.Ct. 1415 (quoting *Warrior & Gulf Navigation,* 363 U.S. at 582, 80 S.Ct. 1347); *accord Lexington Mktg.,* 157 P.3d at 477.

**14.** *See State v. Pub. Safety Employees Ass'n,* 798 P.2d 1281, 1285 (Alaska 1990). An exception to this rule applies when the contract clearly provides that the determination of arbitrability is for the arbitrator. *Id.* The CBA in this case does not so provide. Where a petition to enforce a CBA is filed with the Alaska Labor Relations Agency, the agency has jurisdiction to decide arbitrability, subject to judicial review. *See Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks,* 48 P.3d 1165, 1169–70 (Alaska 2002).

**15.** *Fairbanks Fire Fighters Ass'n, Local 1324,* 48 P.3d at 1169.

## C. Interpreting the Grievance Clause

### 1. Outsourcing may be "an event or condition which affects the conditions or circumstances under which an employee works."

Under the CBA only grievances may be arbitrated. The grievance clause defines "grievance" as

> a claim by an employee based upon an event or condition which affects the conditions or circumstances under which an employee works caused by misinterpretation or inequitable application of District policies or procedures on personnel matters directly pertaining to these conditions or circumstances, and/or the terms of this Agreement and amendments thereof.

The superior court determined that the CEA's claim was not arbitrable because outsourcing could not plausibly be characterized as an "event or condition" which affects the " 'condition' and 'circumstance' *under* which an employee works." In the court's words, "[t]he plain language of the clause indicates that the parties designed it to address grievances by employees related to unfair treatment by the District relating to the wages, hours and conditions of employment."

We are not so sure that this reading is correct. Outsourcing, which in this case involved laying off custodial workers in order to replace them with services provided by a contractor, is plausibly an "event" that affects the "circumstances" under which employees work. When a custodial employee's job is outsourced, the conditions and circumstances under which he works are affected because the worker is no longer employed. Something may *affect* the conditions or circumstances under which an employee works without itself being a condition or circumstance under which the employee works.[16]

We therefore decline to rule that the District's decision to outsource is not arbitrable

because it does not affect the conditions or circumstances "under which" employees work.

### 2. The District's decision to outsource was not a "misinterpretation" or "inequitable application" of a term of the agreement.

The question presented is whether the arbitration clause in the CBA between the District and the CEA can reasonably be interpreted in such a way that allows the District's decision to be arbitrated. The grievance clause permits the arbitration of claims based on an "event or condition" affecting the "conditions or circumstances under which an employee" works in two situations: first, where those events or conditions are caused by a "misinterpretation or inequitable application" of District "policies and procedures on personnel matters," and second, where they are caused by a "misinterpretation or inequitable application" of the terms of the CBA. We conclude that the CEA's alleged grievance does not fit either of these situations.

We address first the possibility that the CEA's claim is based on the District's misinterpretation or inequitable application of the terms of the agreement. The CEA points to no term in the contract that the District has misinterpreted or inequitably applied. And indeed it is hard to see how it could. There is no clause in the CBA discussing outsourcing, nor is there a clause which specifies the rights of management, both of which would be plausible candidates for "misinterpretation" or "inequitable application."[17]

The CEA's argument about a possible oral side contract between the CEA and the District regarding outsourcing is unavailing. Alaska Statute 23.40.210(a), a subsection of the Public Employment Relations Act (PERA), requires that collective bargaining

---

16. The District seems tacitly to accept this possibility when it writes in its brief that, "[i]n fact, the Agreement specifically includes procedures for transfers, demotions, job sharing, *layoff and rehire,* reductions in force *and other negotiated subjects affecting* 'the conditions or circumstances under which an employee works.' " (Emphasis added.)

17. As the CEA notes, "[t]he agreement does not contain a clause which expressly vests the District with broad authority to contract for services, nor does it reserve to the District all rights not specifically limited by the agreement; there is no management rights clause."

agreements be in writing.[18]  We think the subsection acts as a kind of specialized statute of frauds, under which oral agreements are not permitted.  Thus, if there was an oral agreement between the parties it would be invalid under subsection .210(a).

■■■  To the extent subsection .210(a) may be seen instead as a sort of statutory parol evidence rule, it could be argued that evidence of an oral agreement regarding outsourcing could be used to interpret ambiguous terms of the CBA that are reasonably susceptible to an interpretation that outsourcing is prohibited.[19]  Oral agreements can be so used with respect to integrated written contracts that are subject to the parol evidence rule.[20]  But no benefit to the CEA is gained from this possibility, because there are no clauses in the CBA that even hint at a ban on outsourcing.

The District has referred us to a case which in some respects resembles the present one.  In *Local Union No. 483, International Brotherhood of Boilermakers v. Shell Oil Co.*, the district court refused to require arbitration of complaints that arose when an employer decided to contract out work on a refinery renovation project.[21]  Under the collective bargaining agreement arbitration was limited to complaints arising out of the interpretation or application of the agreement.[22]  The district court found that the agreement did not prohibit or limit the practice of contracting out.[23]  On appeal the circuit court affirmed, stating with reference both to a prior case [24] and the case before it:

> [F]undamentally the question decided there, and here, is that where arbitration is limited in the bargaining agreement to questions involving the application and interpretation of the agreement, and the agreement does not limit the freedom of the employer to contract out work, a court should not compel arbitration.[25]

■■■  As did the court in *Local Union No. 483*, we conclude that arbitration may not be compelled here under the portion of the grievance clause that permits arbitration of claims caused by the misinterpretation or misapplication of the CBA because the CBA does not forbid or limit outsourcing.  The dissent offers several other federal circuit opinions that are said to reach contrary results.[26]  We believe that these cases mainly represent differences in how settled principles should be applied because most of them advert to the need for a threshold finding as to whether a particular grievance raises a question concerning the interpretation of the collective bargaining agreement.[27]  This is

---

18.  AS 23.40.210(a) provides in part: "Upon the completion of negotiations between an organization and a public employer, if a settlement is reached, the employer shall reduce it to writing in the form of an agreement."

19.  Even without the statutory requirement that collective bargaining agreements be in writing, the parol evidence rule would apply to the integrated agreement before the court.  *See Air Line Pilots Ass'n v. Midwest Express Airlines*, 279 F.3d 553, 557–58 (7th Cir.2002) (parol evidence rule applies to collective bargaining agreements).

20.  *See Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 583–84 (Alaska 1989).

21.  369 F.2d 526, 527 (7th Cir.1966).

22.  *Id.*

23.  *Id.*

24.  *Indep. Petroleum Workers of Am., Inc. v. Am. Oil Co.*, 324 F.2d 903, 906 (7th Cir.1963) (holding that where collective bargaining agreement is silent on employer's right to contract out work arbitration may not be compelled under arbitration clause limited to questions arising from the application or interpretation of the agreement), *aff'd per curiam by an equally divided court*, 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964).

25.  *Local Union No. 483*, 369 F.2d at 528–29.

26.  Dissent, at 330–32.

27.  For example, in *Building Materials & Construction Teamsters, Local 216 v. Granite Rock Co.*, 851 F.2d 1190 (9th Cir.1988), the court stated that "once the court determines that the parties' dispute concerns the proper interpretation of the agreement, it has 'no business weighing the merits of the grievance.'"  *Id.* at 1194 (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)).  This statement is not inconsistent with our decision because we have determined that the parties' dispute does not concern the proper interpretation of the agreement.  Here, as we have noted, the CEA points to no term in the contract that the District has misinterpreted.  *Supra* page 354.  Similarly, in *International Un-*

not to say that all federal labor law cases decided by the circuit courts are necessarily consistent either in principle or in spirit with our opinion in the present case.[28] But our opinion is consistent with the United States Supreme Court case relied on by the dissent, *AT & T Technologies, Inc. v. Communications Workers of America.*[29]

In *AT & T* the collective bargaining agreement provided that "differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder" would be arbitrated but expressly excluded from arbitration certain management prerogatives.[30] One article provided that "subject to the limitations contained in the provisions of this contract, but otherwise not subject to the provisions of the arbitration clause," the employer could exercise such management functions as hiring, placing, and terminating employees.[31] Still another section, Article 20, provided for layoffs "[w]hen lack of work necessitates layoff."[32] The employer laid off its installers at a particular location and the union sought arbitration, claiming that because there was no lack of work at the location the layoffs would violate Article 20.[33] The district court ordered arbitration, concluding that "the union's interpretation of Article 20 was at least 'argua-

ble.'"[34] The circuit court affirmed, noting that it understood the district court to have ordered the arbitrator to decide the threshold issue of arbitrability.[35] On certiorari, the United States Supreme Court reversed.[36]

The Supreme Court began with familiar general principles: arbitration is a matter of contract and only disputes that the parties have agreed to submit to arbitration should be arbitrated; questions of arbitrability are for the courts; in deciding arbitrability courts should not rule on the merits of the underlying controversy; and there is a presumption in favor of arbitrability.[37] The Court then turned to the policy reasons underlying the need for courts to determine arbitrability:

> The willingness of parties to enter into agreements that provide for arbitration of specified disputes would be "drastically reduced," however, if a labor arbitrator had the "power to determine his own jurisdiction...." Were this the applicable rule, an arbitrator would not be constrained to resolve only those disputes that the parties have agreed in advance to settle by arbitration, but, instead, would be empowered "to impose obligations outside the contract

---

ion of *Electrical, Radio & Machine Workers v. General Electric Co.*, 332 F.2d 485 (2d Cir.1964), although the collective bargaining agreement contained no express provisions regarding outsourcing, the court observed that the union had claimed that the subcontracting proposed there violated several provisions of the collective bargaining agreement: "the union certainly called into question the proper interpretation to be accorded several provisions of this collective bargaining agreement." *Id.* at 487–90. In the present case CEA has not, by contrast, called to our attention any clauses of the collective bargaining agreement that might reasonably be interpreted to prohibit outsourcing. Likewise, in *International Brotherhood of Electrical Workers, Local 1228 v. WNEV–TV, New England Television Corp.*, 778 F.2d 46 (1st Cir.1985), the court observed: "Once the district court made the threshold finding that plaintiff's claims 'appear[ed] to create an issue sufficiently substantial to require submission to an arbitrator,' its judicial function was at an end." *Id.* at 48. We decide here that no sufficiently substantial issue concerning the CBA's meaning has been presented.

**28.** We do not agree that a claim becomes arbitrable merely based on a general allegation that a policy of a public employer violates the terms of

a collective bargaining agreement without any plausible reference to the terms of the agreement, express or implied, said to be violated. Were we to rule otherwise, virtually any policy, even if clearly within the province of a democratically elected board or assembly, could be made subject to the jurisdiction of an appointed labor arbitrator merely as a matter of pleading.

**29.** 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

**30.** *Id.* at 645, 106 S.Ct. 1415.

**31.** *Id.*

**32.** *Id.*

**33.** *Id.* at 645–46, 106 S.Ct. 1415.

**34.** *Id.* at 646–47, 106 S.Ct. 1415.

**35.** *Id.* at 647, 106 S.Ct. 1415.

**36.** *Id.* at 648, 106 S.Ct. 1415.

**37.** *Id.* at 648–50, 106 S.Ct. 1415.

limited only by his understanding and conscience." [38]

Based on these policy reasons the Court found that the lower courts had erred in ordering the parties to arbitrate without first determining arbitrability:

It is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning layoffs predicated on a "lack of work" determination by the Company. If the court determines that the agreement so provides, then it is for the arbitrator to determine the relative merits of the parties' substantive interpretations of the agreement. It was for the court, not the arbitrator, to decide in the first instance whether the dispute was to be resolved through arbitration.[39]

The Court stated that the issue on remand is whether, because of express exclusion or other forceful evidence, the dispute over the interpretation of Article 20 of the contract, the layoff provision, is not subject to the arbitration clause. That issue should have been decided by the District Court and reviewed by the Court of Appeals; it should not have been referred to the arbitrator.[40]

As in *AT & T*, it is the duty of the judiciary in the present case to interpret the CBA to determine whether the parties intended to arbitrate the issue of outsourcing. We have concluded that they did not, for the reasons already expressed. In addition, PERA's limited provision for binding "interest" arbitration—arbitration that resolves impasses in contract formation—provides further forceful evidence that requiring arbitration here would be improper.

PERA governs collective bargaining between units of state and local government

and their employees.[41] Subsection .200(a) of the act defines three classes of employees: (1) those whose services are indispensable, (2) those whose services may be briefly suspended, and (3) those whose services may be suspended for long periods of time without adverse effects.[42] The CEA represents employees of the third class, (a)(3). PERA provides that (a)(1) employees may not strike, but they may compel binding arbitration of disputes that arise in negotiating collective bargaining agreement terms. Employees in classes (a)(2) and (a)(3) may strike.[43] In *Alaska Public Employees Ass'n v. City of Fairbanks* [44] we explained that (a)(2) and (a)(3) employees lack the ability to compel binding interest arbitration:

So, although the legislature has taken from the (a)(1) employees their right to strike, it has given, as a *quid pro quo*, the statutory right to compulsory binding arbitration. Since the class (a)(2) and (a)(3) employees have the right to strike, they do not have this arbitration right. [45]

Since interest arbitration for (a)(3) employees is distinctly not state policy, care must be taken to distinguish cases where grievances are sought to be arbitrated from cases where the arbitration objective is to amend a collective bargaining contract by adding a provision that it cannot fairly be said to contain. Because the CBA simply does not speak to the subject of outsourcing, the CEA's complaint is of the latter type.

In summary, there are a number of forceful indicators pointing to the conclusion that the question whether outsourcing is prohibited by the CBA should not be arbitrated. One is, as indicated above, because interest arbitration for (a)(3) employees is not provided by PERA. Two others are contained in the collective bargaining agreement itself.

38. *Id.* at 651, 106 S.Ct. 1415 (quoting Archibald Cox, *Reflecting Upon Labor Arbitration*, 72 Harv. L.Rev. 1482, 1509 (1959)).

39. *Id.*

40. *Id.* at 652, 106 S.Ct. 1415.

41. *See generally* AS 23.40.070 *et seq.* Because the District is a unit of local government, the CBA is governed by Alaska state law and not

federal labor law. *See* 29 U.S.C. § 152(2) (2000); *Casey v. City of Fairbanks,* 670 P.2d 1133, 1138 (Alaska 1983).

42. AS 23.40.200(a).

43. AS 23.40.200(b)-(d).

44. 753 P.2d 725 (Alaska 1988).

45. *Id.* at 727.

Clause (4)(b) of the arbitration clause provides that the arbitrator "can add nothing to, nor subtract anything from, the agreement between the parties or any policy of the school board." The agreement goes on to state that the written collective bargaining agreement is the whole of the parties' agreement, bargaining on new terms may not be compelled during the term of the agreement, and no side agreements survive. Article XIII.B provides:

> It is agreed that this Labor Agreement contains the full and complete agreement between the parties on all subjects upon which the parties did bargain or could have bargained. Neither party shall be required, during the term of this Agreement, to negotiate or bargain upon any other issue. This Agreement terminates all prior agreements and understandings, and concludes collective bargaining for this Agreement.

Finally, PERA itself makes clear that collective bargaining agreements must be in writing, meaning that when we address the question whether a dispute plausibly involves the interpretation or application of a term of an agreement, we look to the written agreement. Here, the written agreement is silent on the subject of outsourcing.

3. **The District's decision to outsource was not a "misinterpretation" or "inequitable application" of a District policy or procedure.**

The CEA points out that the language of the grievance clause is broader than one that merely allows grievances based on a violation or misinterpretation of specific terms of a contract.[46] Under the CBA a claim based on an event or condition affecting conditions of employment "caused by misinterpretation or inequitable application of District policies or procedures on personnel matters" is grievable and arbitrable. The CEA argues, albeit briefly and in a conclusory fashion, that the District's decision to outsource is a policy that is being inequitably applied to the workers who have lost their bargaining unit jobs as a result of outsourcing.[47] The CEA's argument is not that the outsourcing policy is inequitable on a case-specific basis; rather, the CEA argues that outsourcing is inherently inequitable. But this amounts to an attack on the policy itself. The CBA makes clear that the merits of any policy of the school board may not be altered by the arbitrator. Clause IV(B) of the grievance procedure of the CBA provides: "The arbitrator shall limit himself to the issue submitted to him and shall consider nothing else. He can add nothing to, nor subtract anything from the Agreement between the parties or any policy of the School Board." The same conclusion is inherent in the grievance clause itself. Only misinterpretations or inequitable applications of policies may be grieved, not the policies themselves. Thus the CEA's challenge to the outsourcing policy is not subject to arbitration.[48]

If the District's outsourcing policy were allegedly applied inequitably, as for example

---

46. The "standard" form of arbitration clause has been said to be one that provides for the arbitration of any "disputes, misunderstandings, differences or grievances arising between the parties as to the meaning, interpretation and application of ... this agreement." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 571, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) (Brennan, J., concurring) (emphasis added).

47. CEA's entire argument on this point in its initial brief is as follows:

> The Superior Court's decision thus is not plausible. Even if the grievance does not raise a contractual question, which it does, certainly the District's decision to eliminate bargaining unit jobs as a consequence of outsourcing raises a policy question whether the District has "inequitably" affected their economic interests and the conditions or circumstances under which employees work. Since the clause at issue in this case is broad and far reaching, encompassing both alleged violations of the agreement and inequitable policy decisions affecting employee working conditions, the Superior Court erred in concluding that "accepting CEA's argument would require the court to unreasonably interpret the language in the grievance clause."

CEA adds the following observation on this point in its reply brief: "On the other hand, Article XI (A)(3) [defining a grievance] is readily capable of being interpreted to cover a dispute about an outsourcing policy decision that eliminated the jobs of 112 employees."

48. The CEA also argues that the superior court erred in concluding that outsourcing was not a "mandatory subject of bargaining." In light of our decision in this case we have no need to address this question.

by eliminating only the jobs of politically disfavored employees, a claim so charging would be arbitrable. But to the extent job loss is merely the result of the outsourcing policy, no arbitrable claim is presented because permitting arbitration for job losses that are the inherent result of an outsourcing policy would be to allow a challenge to the existence of the policy itself. This is not permitted under the CBA.

For the above reasons we conclude that the outsourcing question presented by the CEA is not arbitrable. To use the language employed by the United States Supreme Court in *AT & T*, to leave that question to the arbitrator under the facts and circumstances of this case would be to empower the arbitrator "to impose obligations outside the contract limited only by his understanding and conscience." [49]

### D. There Is No Statutory Bar Against Outsourcing Custodial Work.

█ The CEA sought a declaration from the superior court that AS 14.14.060(f) prohibits the District from outsourcing custodial services. The particular language relied on by the CEA is contained in the first sentence of subsection (f): "The borough school board shall provide custodial services and routine maintenance for school buildings and shall appoint, compensate, and otherwise control personnel for these purposes." The CEA interprets this statute to require school districts to provide custodial services through employees of the school district rather than by contracting for such services through independent contractors.

The District argued in the superior court that outsourcing of custodial services is consistent with the statute: "The statute does not mandate how the District can or should provide the custodial services; it does not say the District must directly employ members of CEA and that it cannot hire the services to be accomplished by non-employees." [50] The superior court adopted the District's reasoning.

The language of the sentence in subsection .060(f) relied on by the CEA is ambiguous with respect to whether it is meant to limit school districts to providing custodial services through school district employees. If there were legislative history indicating such an objective we might construe the statute as prohibiting the outsourcing of custodial services. But there is no such evidence.

The language of AS 14.14.060(f) on which the CEA relies is part of a statute originally enacted in 1972. [51] The objective of the statute was to provide for the allocation of functions between borough school boards and borough assemblies. [52] The first sentence of AS 14.14.060(f) taken in the context of the rest of the language of that subsection, and the context of the whole of AS 14.14.060, suggests that its objective was merely to make clear that borough school boards rather than borough assemblies would have the responsibility to provide, pay for, and control the provision of custodial services for school buildings.

We therefore agree with the rationale accepted by the superior court and affirm the superior court's refusal to issue a declaratory judgment declaring that the outsourcing of custodial services is prohibited by AS 14.14.060(f). [53]

---

**49.** *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting Cox, *supra* note 38, at 1509).

**50.** The District makes the same argument on appeal.

**51.** Ch. 118, § 8, SLA 1972.

**52.** Thus the full text of AS 14.14.060(f) reads:

The borough school board shall provide custodial services and routine maintenance for school buildings and shall appoint, compensate, and otherwise control personnel for these purposes. The borough assembly through the

borough administrator, shall provide for all major rehabilitation, all construction and major repair of school buildings. The recommendations of the school board shall be considered in carrying out the provisions of this section.

**53.** Although only the possible application of AS 14.14.060(f) to outsourcing is at issue in the present case, we note that in *Moore v. State, Department of Transportation & Public Facilities*, 875 P.2d 765 (Alaska 1994), we held that outsourcing was not categorically prohibited by the merit system provision in the Alaska Constitution, article XII, section 6, or by the state statutes that were arguably applicable to the *Moore* case. *Id.* at 770–71. Noting the possibility that abuses

## V. CONCLUSION

For the above reasons, the decision of the superior court is AFFIRMED.

FABE, Chief Justice, with whom CARPENETI, Justice, joins, dissenting.

FABE, Chief Justice, with whom CARPENETI, Justice, joins, dissenting.

The court's decision today rests entirely on its determination that, contrary to the contentions of the Classified Employees Association (CEA), the parties' collective bargaining agreement (CBA) cannot plausibly be read to prohibit or limit outsourcing by the Matanuska–Susitna Borough School District. Because I believe that the determination whether CEA's interpretation of the CBA is plausible should be made by the arbitrator, not by the court, I disagree with the court and would reverse the superior court's decision not to compel arbitration.

CEA claims that the District's outsourcing decision violated the parties' CBA. Under the CBA's grievance arbitration clause, employee grievances alleging "misinterpretation or inequitable application" of the terms of the CBA are arbitrable.[1] CEA's claim that outsourcing violates the terms of the CBA, whether meritorious or wildly improbable, is a grievance regarding the proper interpretation of the CBA and is thus the type of grievance that the parties have agreed to arbitrate.

The court concludes otherwise first by determining that the CBA cannot reasonably be interpreted to prohibit outsourcing, then by reasoning that therefore CEA's complaint about outsourcing does not actually involve interpretation of the CBA, and finally by concluding that CEA's complaint is thus not actually encompassed by the arbitration clause.[2] But in doing so the court directly hinges its decision regarding the *arbitrability* of CEA's claim on its own view of the *merits* of CEA's claim—something that is not generally appropriate in the context of labor arbitration.

The court is correct that the threshold question of whether a claim is arbitrable is one for the courts, not for the arbitrator.[3] A court confronting this question must determine, keeping in mind the presumption in favor of arbitrability,[4] whether there is a plausible interpretation *of the CBA's arbitration clause* (taking into account any exclusionary clauses) that covers the type of claim presented. But in doing so the court should not examine the plausibility *of the claim itself.*

Where, as here, the CBA's arbitration clause explicitly covers all claims alleging "misinterpretation or inequitable application" of the terms of the CBA, and there is no exclusionary clause, the court's role is limited to deciding whether the claim, on its face, concerns the proper interpretation of the CBA. The court concludes here that CEA's grievance "does not concern the proper interpretation of" the CBA.[5] But CEA contends that the CBA prohibits outsourcing—asserting, among other things, that the CBA's silence regarding outsourcing means that outsourcing is not permitted. While perhaps practically or legally incorrect, this claim inescapably involves interpretation of the CBA. Though the court finds CEA's interpretation of the CBA untenable, it is nonetheless an interpretation of the CBA. And choosing between competing interpretations of the CBA is precisely the task the parties have agreed to put in the hands of the arbitrator.

Because the instant case does not fall under the National Labor Relations Act,[6] we

---

of privatization might occur, we observed that these should be addressed through "existing contractual, administrative, and judicial channels for case-by-case review of agency action." *Id.* at 773. *Moore* is thus consistent with the conclusions we reach in this opinion that outsourcing is not prohibited by law and inequitable applications of outsourcing are arbitrable on a case-by-case basis.

1. The CBA's grievance arbitration clause is quoted in full at 354.

2. Majority Op. at 354–55.

3. Majority Op. at 353.

4. Majority Op. at 352–53.

5. Majority Op. at 355–56 n. 27.

need not necessarily adopt the reasoning of federal labor law cases; however, as the court seemingly acknowledges,[7] such cases are nonetheless instructive. In *AT & T Technologies, Inc. v. Communications Workers of America*, the United States Supreme Court reviewed and reaffirmed various basic legal principles pertaining to the arbitrability of labor disputes, including that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims" and that "[w]hether 'arguable' or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator."[8]

The court notes that "CEA points to no term in the contract" to support its position and that furthermore there is "no clause in the CBA discussing outsourcing."[9] But the fact that CEA's claim that outsourcing violates the CBA may not be plausible and is not necessarily supported by any specific language in the CBA does not mean that it is not arbitrable. In *Building Materials & Construction Teamsters Local No. 216 v. Granite Rock Co.*, a case that we have recently cited,[10] the Ninth Circuit found that a union's claim that an employer violated an *implied* term of a CBA was arbitrable under an arbitration clause that covered only disputes "arising under" the CBA, regardless of whether the union's claim was plausible or supported by any language in the CBA.[11] Though the employer argued that the CBA could not be reasonably interpreted to contain the implied term that provided the basis for the union's claim, the Ninth Circuit reasoned that "[t]he district court was not required to determine whether the union's claim rested on a 'plausible' reading of the agreement"[12] and that "once the court determines that the parties' dispute concerns the proper interpretation of the agreement, it has 'no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.'"[13]

Similarly, in *International Brotherhood of Electrical Workers, Local 1228 v. WNEV–TV, New England Television Corp.*, the First Circuit concluded that a union's claim—maintaining that an employer had violated the parties' CBA by eliminating an employee lounge—was arbitrable under an arbitration clause that encompassed "all complaints, disputes or questions as to the interpretation,

6. *See* 29 U.S.C. § 152(2) (2000).

7. *See* Majority Op. at 355 (citing *Local Union No. 483, Int'l Bhd. of Boilermakers v. Shell Oil Co.*, 369 F.2d 526 (7th Cir.1966)).

8. 475 U.S. 643, 649–50, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). *AT & T*, though it eloquently summarizes these important basic principles, is factually distinguishable from the instant case in that *AT & T* involved competing interpretations of an exclusionary clause in the CBA asserted by the employer to preclude arbitration of a particular dispute. *Id.* at 644–46, 106 S.Ct. 1415. Because the threshold question of arbitrability must be decided by the court, the *AT & T* Court held that it was improper for the trial court to submit to the arbitrator the issue of the proper interpretation of the CBA's arbitration and exclusionary clauses. *Id.* at 651, 106 S.Ct. 1415. In this case, by contrast, it is not competing interpretations of the CBA's arbitration clause or of an exclusionary clause that are at issue, but competing substantive interpretations of the CBA. Indeed, the *AT & T* Court acknowledged that if the arbitration provisions were in-

terpreted to cover the type of dispute at issue it would be "for the arbitrator to determine the relative merits of the parties' substantive interpretations of the agreement." *Id.*

9. Majority at 354.

10. *Lexington Mktg. Group, Inc. v. Goldbelt Eagle, LLC*, 157 P.3d 470 n. 46 (Alaska 2007) (citing and quoting *Granite Rock* for the proposition that "[b]y providing that '[a]ll disputes arising under this agreement' shall be resolved through arbitration, the parties agreed 'to submit *all* grievances to arbitration, not merely those which the court will deem meritorious'" (second alteration in original)).

11. 851 F.2d 1190, 1193–95 (9th Cir.1988).

12. *Id.* at 1194.

13. *Id.* (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)).

application or performance of" the CBA.[14] The First Circuit came to this conclusion despite the fact that the trial court found that there was no language in the CBA creating a duty to provide or maintain such a lounge.[15] The court in *WNEV–TV* recognized that

> [w]hat one man considers frivolous another may find meritorious, and it is common knowledge in industrial relations circles that grievance arbitration often serves as a safety valve for troublesome complaints. Under these circumstances it seems proper to read the typical arbitration clause as a promise to arbitrate every claim, meritorious or frivolous, which the complainant bases upon the contract. The objection that equity will not order a party to do a useless act is outweighed by the cathartic value of arbitrating even a frivolous grievance and by the dangers of excessive judicial intervention.[16]

The Second Circuit in *Procter & Gamble Independent Union of Port Ivory, N.Y. v. Procter & Gamble Manufacturing Co.* rejected a company's contention, similar to the District's contention in this case, that arbitration should be refused because "none of the alleged grievances were specifically covered by any particular provision of the agreement" and the arbitration clause bound it only to the arbitration of grievances "having to do with the interpretation or application of any provision of" the CBA.[17] The Second Circuit held that the union's grievances, which included a complaint about outsourcing, were arbitrable, reasoning that "the interpretation or construction of the agreement by the Board of Arbitration is the very thing the parties bargained for." [18] The *Procter & Gamble Manufacturing* court did not examine whether or not the union's claims had merit or were grounded in any specific language in the CBA.

Similarly, in *International Union of Electrical, Radio & Machine Workers v. General Electric Co.*, the Second Circuit held that a union's complaint about an employer's subcontracting of work was arbitrable under an arbitration clause encompassing disputes about "the interpretation or application of a provision of" the CBA, despite the employer's argument that the CBA contained no express provisions regarding subcontracting and the fact that the union had unsuccessfully attempted to negotiate for provisions limiting subcontracting.[19] The Second Circuit remarked:

> What the company has done ... is to attempt to persuade us to decide that the grievance is not arbitrable because the grievance is groundless inasmuch as [no] substantive provision of the collective bargaining agreement, according to the company, forbids or restricts subcontracting. But whether a certain brand of company conduct is prohibited by a provision of a collective bargaining agreement will always be the ultimate question which the grievance itself will present.... For us to yield to the urgings of the company and decide it ourselves would be to ignore the admonition contained in the *Warrior & Gulf* case that courts should not become "entangled in the construction of the substantive provisions of a labor agreement." [20]

As the court points out, the above-cited cases do indeed "advert to the need for a threshold finding as to whether a particular grievance raises a question concerning the interpretation of the collective bargaining agreement." [21] But the court here goes beyond simply making a threshold determination as to whether CEA's claim involves interpretation of the CBA—the court examines the merits of CEA's interpretation and then concludes that because CEA's interpretation is not reasonable, *it is not actually an inter-*

---

14. 778 F.2d 46, 46–48 (1st Cir.1985).

15. *Id.* at 48.

16. *Id.*

17. 298 F.2d 644, 645 (2d Cir.1962).

18. *Id.* at 645–47.

19. 332 F.2d 485, 487–90 (2d Cir.1964).

20. *Id.* at 489–90 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 585, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

21. Majority Op. at 355.

*pretation.* Such reasoning puts the cart before the horse and thus is not in line with the predominant federal approach.

The court cites two Seventh Circuit cases in support of its decision: *Local Union No. 483, International Brotherhood of Boilermakers v. Shell Oil Co.* and *Independent Petroleum Workers of America, Inc. v. American Oil Co.*,[22] on which *Local Union No. 483* relies.[23] Each of these cases held that where a CBA was silent with regard to outsourcing, arbitration of an outsourcing dispute could not be compelled under an arbitration clause that limited arbitration to questions arising from CBA interpretation.[24] However, *Local Union No. 483* and *Independent Petroleum Workers* appear to be outliers, and the continued validity of their approach has been questioned.[25] Moreover, the court in *Independent Petroleum Workers*, on which *Local Union No. 483* relies, held that the union's claims were foreclosed by collateral estoppel, making it unclear whether its

discussion of their arbitrability was simply dicta.[26]

Additionally, in both *Local Union No. 483* and *Independent Petroleum Workers* the Seventh Circuit actually considered the bargaining history between the parties in the course of concluding that the CBAs did not prohibit outsourcing (and thus that outsourcing disputes were not arbitrable)[27]—something the court here seems unwilling to do despite CEA's entreaties.[28] And in both of these cases the bargaining history between the parties was the *opposite* of the bargaining history in the instant case—that is, in both of these cases the unions repeatedly tried and failed to negotiate for CBA provisions specifically *prohibiting* outsourcing,[29] whereas in the instant case there is evidence that the employer tried and failed to negotiate for CBA provisions specifically *permitting* outsourcing.[30] Accordingly, to the extent that these two cases relied on bargaining history to interpret the

**22.** Majority Op. at 355 (citing *Local Union No. 483, Int'l Bhd. of Boilermakers v. Shell Oil Co.*, 369 F.2d 526 (7th Cir.1966); *Indep. Petroleum Workers of Am., Inc. v. Am. Oil Co.*, 324 F.2d 903 (7th Cir.1964), *aff'd per curiam by an equally divided court*, 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964)).

**23.** 369 F.2d at 528–29.

**24.** *Local Union No. 483*, 369 F.2d at 527–29; *Indep. Petroleum Workers*, 324 F.2d at 906–07.

**25.** *See Int'l Bhd. of Elec. Workers, Local 21 v. Ill. Bell Tel. Co.*, 491 F.3d 685, 689–90 (7th Cir.2007) (narrowing and limiting *Independent Petroleum Workers*, stating that "Supreme Court precedent constrains a broad reading of *Indep[endent] Petroleum Workers*, which centered around parties with a unique bargaining history and CBA"); *Mobil Oil Corp. v. Local 8–766, Oil, Chem. & Atomic Workers Int'l Union*, 600 F.2d 322, 328–29 (1st Cir.1979) (discussing *Independent Petroleum Workers* as limited to its specific facts and its arbitrability reasoning as potentially dicta); *Local 710, Int'l Bhd. of Teamsters v. Montgomery Ward & Co.*, 708 F.Supp. 209, 212 (N.D.Ill.1989) (questioning and limiting *Independent Petroleum Workers*).

**26.** *Indep. Petroleum Workers*, 324 F.2d at 909.

**27.** *Local Union No. 483*, 369 F.2d at 528 ("The district court found that the bargaining history between Shell and the Union shows that the Union had sought without success to have Shell agree to a provision in the agreement 'specifi-

cally prohibiting or limiting' Shell's right to contract out work, and that each proposal was rejected by Shell and none included in the agreement. This finding has substantial support in the record."); *Indep. Petroleum Workers*, 324 F.2d at 907 ("The bargaining history between plaintiff and defendant relative to the right of the latter to contract out work is much discussed in the briefs. Plaintiff urges that such history is irrelevant. We think, however, it has some significance and may properly be considered.").

**28.** Majority Op. at 354–55.

**29.** *Local Union No. 483*, 369 F.2d at 528 ("Shell's consistent refusal, in three bargaining agreements, to agree to limit its freedom to contract out the work, the settlement of the strike and that issue without acceding to the Union demand, and the Union's tacit acceptance of Shell's position in its December, 1962, letter distinguish contracting out cases in which courts have compelled arbitration."); *Indep. Petroleum Workers*, 324 F.2d at 907 ("[P]laintiff for many years had sought the inclusion of a clause in the collective bargaining agreement specifically prohibiting or limiting the right of the defendant to contract out work. On each occasion the proposal was rejected. This bargaining history while of course not controlling fortifies the conclusion which we have reached that plaintiff's claim is without merit.").

**30.** Majority Op. at 350.

CBA's silence regarding outsourcing, they are importantly distinguishable from the instant case.[31]

Coupled with the strong presumption in favor of arbitrability, which is accurately set forth in the court's opinion,[32] the many cases admonishing against delving into the merits of a union's claim in order to determine its arbitrability suggest that the court has chosen to take a distinctly minority approach by resting its decision on a preliminary determination that CEA's interpretation of the CBA is implausible.

The court attempts to bolster its decision to take this minority approach by pointing out that the Public Employment Relations Act (PERA)[33] does not give CEA's employees the power to compel binding interest arbitration. But this is irrelevant. CEA seeks only grievance arbitration, which the parties have specifically contracted for, not interest arbitration. CEA claims that the District's outsourcing violates the parties' *existing* CBA—it does not seek to compel arbitration for the purpose of renegotiating the terms of the CBA. The court thinks that CEA's interpretation of the CBA is implausible and thus characterizes CEA's claim not as a dispute about the interpretation of the CBA but as an effort "to amend a collective bargaining contract by adding a provision that it cannot fairly be said to contain."[34] But the fact that CEA's grievance involves a potentially implausible interpretation of a CBA does not mean that its request for grievance arbitration under the CBA's arbitration clause should be viewed as if it is a request for interest arbitration under PERA. And moreover, as discussed above, the question whether or not CEA's interpretation of the CBA is plausible is a question for the arbitrator, not for the courts—our decision regarding the arbitrability of CEA's claim simply should not turn on our assessment of its relative merits.

As the court points out, under the CBA's arbitration clause the arbitrator "can add nothing to, nor subtract anything from" the CBA.[35] Accordingly, an arbitrator evaluating CEA's outsourcing grievance would be limited to examination and interpretation of the parties' existing CBA and would not have the power to modify the CBA. Thus limited, an arbitrator might well conclude, as the court has concluded, that CEA's interpretation of the CBA is implausible and that "the CBA simply does not speak to the subject of outsourcing."[36] But that determination would be one for the arbitrator to make because "the interpretation or construction of the [CBA] by the [arbitrator] is the very thing the parties bargained for."[37]

Therefore, I respectfully dissent.

---

**31.** *See* 20 RICHARD A. LORD, WILLISTON ON CONTRACTS § 56:46 (4th ed.2001) (discussing the importance of the parties' specific bargaining history to the court's decision in *Local Union No. 483* ).

**32.** Majority Op. at 352–53.

**33.** AS 23.40.070.

**34.** Majority Op. at 357.

**35.** *Id.*

**36.** *Id.*

**37.** *Procter & Gamble Indep. Union of Port Ivory, N.Y. v. Procter & Gamble Mfg. Co.*, 298 F.2d 644, 646 (2d Cir.1962).