**D. S. W., by his next of friends, R. M. W. and J. K. W., Appellants,**

v.

**FAIRBANKS NORTH STAR BOROUGH SCHOOL DISTRICT, Appellee.**

**L. A. H., by his next of friends, L. H. and V. H., Appellants,**

v.

**FAIRBANKS NORTH STAR BOROUGH SCHOOL DISTRICT, Appellee.**

Nos. 4938, 4959.

Supreme Court of Alaska.

May 22, 1981.

Joseph W. Sheehan, Fairbanks, for appellants.

Patrick B. Cole, Staff Atty., J. D. Nordale, Borough Atty., Fairbanks, for appellee.

Before CONNOR, BURKE, and MATTHEWS, JJ., DIMOND, Senior Justice, and BRYNER, Chief Judge, Court of Appeals.

## OPINION

MATTHEWS, Justice.

These cases present the question of whether an action for damages may be maintained against a school district for the negligent classification, placement, or teaching of a student. The superior court concluded that such an action may not be maintained and granted the school district's motions to dismiss. We agree, and affirm.

Because these cases are before us on appeal from orders granting motions to dismiss, we take as true the allegations of the complaints. In essence, they allege the following. L. A. H. is seventeen years old and suffers from a learning disability, commonly known as dyslexia. L. A. H. attended Borough School District schools from kindergarten through the sixth grade during which time the District negligently failed to ascertain that he was suffering from dyslexia. On the last day of L. A. H's second year in the sixth grade the District determined that he was dyslexic. Thereafter, for a time, the District gave him special education courses to assist in overcoming the effects of this disability. These courses were then negligently terminated, despite the District's awareness that L. A. H. had not overcome his dyslexia, and were never resumed. The complaint alleges that L. A. H. has suffered damage caused by the negligent acts and omissions of the District including loss of education, loss of opportunity for employment, loss of opportunity to attend college or post high school studies, past and future mental anguish and loss of income and income earning ability.

D. S. W.'s claim is similar. He too is dyslexic. The School District discovered this condition in the first grade but did not assist him in overcoming it until the fifth grade. The School District gave D. S. W. a special education program during the fifth and sixth grade but negligently discontinued it in the seventh grade knowing that he had not been adequately trained to compensate for dyslexia at that point. Beginning with the seventh grade and continuing to the present the defendant has failed to provide proper education to assist D. S. W. in overcoming his dyslexia. D. S. W. claims money damages against the School District for the same injuries claimed by L. A. H.

Although this is a claim of first impression in Alaska, two other jurisdictions have considered the question whether a claim may be maintained against a school for failing to discover learning disabilities or failing to provide an appropriate educational program once learning disabilities are discovered. In neither of these jurisdictions has a claim for damages been permitted.

The earliest case is *Peter W. v. San Francisco Unified School District*, 131 Cal.Rptr. 854 (Cal.App.1976). There the plaintiff alleged, among other claims, that he suffered from reading disabilities and that the School District was negligent both by failing to discover the disabilities and by placing him in inappropriate classes. The court defined the problem as whether an actionable duty of care existed, which is essentially a public policy question involving the following considerations:

> The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

131 Cal.Rptr. at 859–60.[1] The court noted that the defendant's conduct, the degree of certainty that the plaintiff suffered injury, and the establishment of a causal link between conduct and injury were all highly problematical in educational malpractice claims:

> Unlike the activity of the highway or the marketplace, classroom methodology affords no readily acceptable standards of care, or cause, or injury. The science of pedagogy itself is fraught with different and conflicting theories of how or what a child should be taught, and any layman might—and commonly does—have his own emphatic views on the subject. The "injury" claimed here is plaintiff's inability to read and write. Substantial professional authority attests that the achievement of literacy in the schools, or its failure, are influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process, and beyond the control of its ministers. They may be physical, neurological, emotional, cultural, environmental; they may be present but not perceived, recognized but not identified.
>
> We find in this situation no conceivable "workability of a rule of care" against which defendants' alleged conduct may be measured, no reasonable "degree of certainty that ... plaintiff suffered injury" within the meaning of the law of negligence, and no such perceptible "connection between the defendant's conduct and the injury suffered" as alleged which would establish a causal link between them within the same meaning. [Citations & footnotes omitted].

*Id.* at 860–61. The court also believed that much burdensome and expensive litigation would be generated if such lawsuits were allowed, stating:

> Few of our institutions, if any, have aroused the controversies, or incurred the public dissatisfaction, which have attended the operation of the public schools

---

1. This court applied a similar list of factors in determining whether a cause of action for negligent misrepresentation should exist in *Howarth v. Pfeifer*, 443 P.2d 39, 42 (Alaska 1968).

during the last few decades. Rightly or wrongly, but widely, they are charged with outright failure in the achievement of their educational objectives; according to some critics, they bear responsibility for many of the social and moral problems of our society at large. Their public plight in these respects is attested in the daily media, in bitter governing board elections, in wholesale rejections of school bond proposals, and in survey upon survey. To hold them to an actionable "duty of care," in the discharge of their academic functions, would expose them to the tort claims—real or imagined—of disaffected students and parents in countless numbers. They are already beset by social and financial problems which have gone to major litigation, but for which no permanent solution has yet appeared. The ultimate consequences, in terms of public time and money, would burden them—and society—beyond calculation. [Citations omitted].

*Id.* at 861.

In *Donohue v. Copiague Union Free School District*, 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979), the New York Court of Appeals was faced with a claim similar to that presented in *Peter W.* The court concluded that the claim should not be entertained because it would involve an unjustifiable encroachment by the judiciary in the administration of public education:

> Recognition in the courts of this cause of action would constitute blatant interference with the responsibility for the administration of the public school system lodged by Constitution and statute in school administrative agencies. [Citation omitted].

*Id.* 418 N.Y.S.2d at 378, 391 N.E.2d at 1354.

*Hoffman v. Board of Education of the City of New York*, 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979) presented the problem in a different, and more sympathetic, context. Hoffman, a person of normal intelligence, was negligently diagnosed to be mentally retarded, and was placed for virtually his entire school career in classes for the mentally retarded. A

jury had awarded Hoffman damages of $750,000.00. The Appellate Division affirmed Hoffman's right to recover. 64 A.D.2d 369, 410 N.Y.S.2d 99 (1978). The Court of Appeals reversed, based on *Donohue* and in doing so rejected any distinction between claims involving misfeasance and nonfeasance. 424 N.Y.S.2d at 379, 400 N.E.2d at 320.

*Smith v. Alameda County Social Services Agency*, 90 Cal.App.3d 929, 153 Cal.Rptr. 712 (1979) involved as one of the plaintiff's claims an allegation that he had been negligently placed in a class for the mentally retarded when the school district knew or should have known that he was not retarded. The court ruled that no cause of action was stated, relying on its earlier decision in *Peter W. Id.* at 718–19.

We agree with the results reached in these cases and with the reasoning employed by the California Court of Appeal in *Peter W.* and *Smith.* In particular we think that the remedy of money damages is inappropriate as a remedy for one who has been a victim of errors made during his or her education. The level of success which might have been achieved had the mistakes not been made will, we believe, be necessarily incapable of assessment, rendering legal cause an imponderable which is beyond the ability of courts to deal with in a reasoned way.

No different result is mandated under the Alaska statutes to which appellants have referred us, AS 14.30.180–350, the so-called Education for Exceptional Children Act. Nothing in the Act either expressly or impliedly authorizes a damage claim. The same considerations which preclude a damage claim at common law for educational malpractice preclude inferring one from the Act. Similar statutory claims were also presented, and rejected, in *Peter W. v. San Francisco Unified School District*, 131 Cal. Rptr. at 862, and *Donohue v. Copiague Union Free School District*, 64 A.D.2d 29, 407 N.Y.S.2d 874, 880–81 (App.Div.1978), *aff'd*, 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979).

Our conclusion does not mean that parents who believe that their children have been inappropriately classified or placed are without recourse. AS 14.30.191(c)[2] provides that any parent believing classification or placement to be in error may request an independent examination and evaluation of the child, and for a hearing before a hearing officer in the event of a substantial discrepancy. Further, that section provides that, the proceedings so conducted are subject to the Administrative Procedure Act, which in turn expressly provides for judicial review. AS 44.62.560.

In our view it is preferable to resolve disputes concerning classification and placement decisions by using these, or similar,[3] procedures than through the mechanism of a tort action for damages. Prompt administrative and judicial review may correct erroneous action in time so that any educational shortcomings suffered by a student may be corrected. Money damages, on the other hand, are a poor, and only tenuously related, substitute for a proper education. We recognize, of course, that there may be cases when a student in need of a special placement is negligently not given it by the school district, and the student's parents, having no reason to know of the need, do not initiate an administrative review proceeding. In such cases there are authorities suggesting that corrective tutorial programs may be appropriately mandated.[4] However, we need not reach that question here.

AFFIRMED.

RABINOWITZ, C. J., and COMPTON, J., not participating.

**2.** AS 14.30.191(c) provides:

If a parent or guardian believes that the educational assessment of his child is in error, he may request an independent examination and evaluation of the child. If a substantial discrepancy exists between the educational assessment of the school district and the independent evaluation, and if the parent or guardian so requests, a hearing shall be held before a hearing officer in order to resolve the discrepancy between evaluations and to determine the appropriate educational program placement for the exceptional child. The Department of Education shall adopt regulations for the conduct of hearings authorized by this section and for the appointment and qualifications of the hearing officer. Regulations adopted and proceedings conducted under this section are subject to the Administrative Procedure Act.

**3.** *See* 20 U.S.C. § 1415.

**4.** *See* J. Elson, "A Common-Law Remedy for the Educational Harms Caused by Incompetent or Careless Teaching," 73 Nw.L.Rev. 641, 762–68 (1978); Note, "Implications of Minimum Competency Legislation: A Legal Duty of Care?" 10 Pac.L.J. 947, 967 (1979).