*Notice:* This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| GEOTEK ALASKA, INC., | ) | |
| | ) | Supreme Court No. S-15449 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-12-05453 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JACOBS ENGINEERING GROUP, | ) | |
| INC., and JACOBS FIELD | ) | No. 7031 - August 14, 2015 |
| SERVICES NORTH AMERICA, | ) | |
| INC., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Michael Jungreis and Jason Hartz, Davis Wright Tremaine LLP, Anchorage, for Appellant. Robert J. Dickson and Christopher J. Slottee, Atkinson, Conway & Gagnon, Anchorage, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

An insolvent subcontractor failed to pay its sub-subcontractor for work performed, and the sub-subcontractor sought payment directly from the general contractor through a demand for arbitration. The general contractor declined to

participate. The arbitrator awarded damages to the sub-subcontractor, who filed an action to confirm the award in superior court. The sub-subcontractor also brought a negligence claim, contending that the general contractor knew of its subcontractor's financial instability and negligently failed to ensure that the sub-subcontractor would be paid. The superior court granted summary judgment to the general contractor on both the enforceability of the arbitration award and the viability of the negligence claim. The sub-subcontractor appeals.

We affirm, concluding that whether the general contractor effectively exercised its contractual right to decline arbitration is an issue of arbitrability, correctly decided by the superior court, and that the general contractor had no extra-contractual duty in tort to guarantee its subcontractor's payment obligations.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Jacobs Engineering Group, Inc. was awarded a contract by the United States Air Force for environmental remediation. While preparing to bid on the project, Jacobs Engineering Group and its subsidiary Jacobs Field Services North America, Inc. (collectively "Jacobs") sent out a request for proposal (RFP) for soil sampling services at a tank farm near Nome and at the Nikolski Radio Station on Umnak Island. Included in the RFP was a requirement that the subcontractor have bonding to cover all its payment and performance obligations. One of the recipients of Jacobs's RFP was Precision Sampling, Inc., doing business as Direct Sensing, Inc. (DSI). Ultimately Jacobs awarded the subcontract to DSI. DSI entered into a second-tier subcontract with GeoTek Alaska, Inc., to provide the required Ultra-Violet Optical Screening Tool (UVOST) equipment.

DSI's parent corporation in Canada was undergoing financial difficulties at the time of the bidding process; the parties dispute what Jacobs knew or should have

known about DSI's situation. They also dispute the extent to which Jacobs's award of the subcontract to DSI was because of Jacobs's desire to work with GeoTek. It is undisputed, however, that DSI was unable to obtain the payment and performance bonds required by the RFP and asked Jacobs to waive the requirement. Jacobs agreed to move forward with the DSI subcontract, but it developed a risk management plan requiring that 15 percent of Jacobs's payment to DSI be retained to assure the payment of DSI's second-tier subcontractors and that those second-tier subcontractors submit releases of claims, certifying they had been paid.

Shortly before GeoTek deployed to the Nome project location, it learned that Jacobs had waived its requirement that DSI be bonded. GeoTek nonetheless signed its second-tier subcontract with DSI a few days later. According to its vice president's affidavit, "[a]t that point GeoTek was committed, and had no other work available on short notice; and additionally was reassured by Jacobs's policy of ensuring that its lower tier subcontractors are paid."

DSI and GeoTek satisfactorily completed the Nome project. Jacobs paid DSI and DSI signed a release in September 2009, certifying that it had paid for all services furnished in connection with the contract. Jacobs did not retain any amounts or require a release from GeoTek, as contemplated by the risk management plan. In September 2009, DSI and GeoTek attempted deployment to Nikolski but were delayed in Dutch Harbor because of weather. The project was eventually put off until 2010 but, for reasons not relevant to this appeal, DSI and GeoTek never reached Nikolski and never did any work there.

DSI did not pay GeoTek for its work on the Nome project or for its 2009 mobilization for Nikolski.

**B.      Proceedings**

Jacobs's contract with DSI included an arbitration provision that is central to this appeal. The provision's language will be dissected later in this opinion, but in summary it gives Jacobs the unilateral right to accept or reject arbitration once a demand has been made. Jacobs did not have a contract with GeoTek, but Jacobs's contract with DSI included a provision that required DSI to " 'flow down' all terms and conditions of the subcontract into any sub-subcontract." The Jacobs-DSI contract also had a provision on assignment, which provides:

> Neither this Subcontract nor any interest therein including any claim thereunder shall be assigned or transferred by the Subcontractor to another entity, except as expressly authorized in writing by the Subcontract Manager. The Company reserves the exclusive right to assign this Subcontract and all rights and interest therein.

In a demand for arbitration dated April 28, 2010, GeoTek asserted a claim against Jacobs for the amounts DSI had failed to pay it.[1] The demand was apparently forwarded to Jacobs by the American Arbitration Association (AAA). Jacobs responded to GeoTek's demand for arbitration on May 13, asserting in a letter to the AAA that "Jacobs does not have a contract with Geo Tek and therefore, Geo Tek has no bona fide contract claim against Jacobs and it would be inappropriate for Jacobs to engage Geo Tek in an arbitration proceeding." Jacobs stated that it "rejects Geo Tek's demand for arbitration and recommends that Geo Tek pursue its contractual rights and claims against its customer, [DSI]."

GeoTek proceeded alone with arbitration under the aegis of the AAA. On January 20, 2011, DSI and GeoTek executed an agreement in which they asserted that

---

[1]      GeoTek's arbitration demand is not in the record, but neither party disputes that it was made; its date is referenced in Jacobs's response.

"[n]either DSI [nor GeoTek has] been paid in full by Jacobs for the work done on the West Nome or Nicolski [sic] Projects" and DSI assigned its claims against Jacobs to GeoTek, retaining a right to 30 percent of any amounts collected. On GeoTek's motion, the arbitrator then ruled on the arbitrability of these claims, deciding that both GeoTek's original claims against Jacobs and DSI's assigned claims were arbitrable. The arbitrator allowed GeoTek to amend its demand for arbitration to include both sets of claims and gave Jacobs 14 days to respond to the amended demand. The record shows no further written response from Jacobs.

The arbitrator held an evidentiary hearing in August 2011, which was attended only by representatives of GeoTek and DSI; the arbitrator's findings of fact and conclusions of law note that Jacobs was again contacted but declined to participate. The arbitrator awarded GeoTek $257,687.62 "on behalf of work done by GeoTek Alaska and [DSI]," with interest continuing to accrue at 10.5 percent per annum.

GeoTek filed a complaint in superior court seeking to confirm the arbitration award and asserting several other theories of recovery against Jacobs, including breach of contract, unjust enrichment, quantum meruit, and breach of the covenant of good faith and fair dealing. Jacobs answered and moved for summary judgment, arguing that it had no contract with GeoTek and, if it did, it had effectively exercised its contractual right to refuse to arbitrate. GeoTek filed a cross-motion to confirm the arbitration award. The superior court granted Jacobs's summary judgment motion, concluding that Jacobs "timely rejected GeoTek's demand to arbitrate . . . [and that] Jacobs was not legally obligated to participate in the arbitration."

While the court's decision of these motions was pending, GeoTek amended its complaint to assert a negligence claim. Jacobs moved for summary judgment on that claim as well, and the superior court granted summary judgment on the ground that Jacobs did not owe GeoTek a duty of care in tort to ensure it was paid by DSI.

On appeal GeoTek argues that the superior court erred in granting Jacobs's motions for summary judgment. GeoTek argues that (1) it had an agreement to arbitrate with Jacobs, and it was up to the arbitrator to decide whether Jacobs had exercised its right to reject arbitration; and (2) Jacobs had an actionable duty in tort to protect GeoTek's financial interests.

## III. STANDARDS OF REVIEW

"A superior court's decision reviewing an arbitration award is subject to de novo review."[2] "Whether [a] claim is arbitrable is a question of law subject to de novo review."[3] The existence and extent of a duty of care also presents a question of law, which we review de novo.[4]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Granting Summary Judgment To Jacobs On The Arbitrability Issue.

The superior court correctly decided that whether Jacobs had agreed to arbitrate this dispute was a question for the court rather than the arbitrator. The superior court then relied on the specific language of the arbitration provision at issue to conclude, again correctly, that Jacobs did not agree to arbitrate this dispute and that the award therefore could not be confirmed.

---

[2] *Johnson v. Aleut Corp.*, 307 P.3d 942, 947 (Alaska 2013).

[3] *Lexington Mktg. Grp., Inc. v. Goldbelt Eagle, LLC*, 157 P.3d 470, 472 (Alaska 2007).

[4] *Hurn v. Greenway*, 293 P.3d 480, 483 (Alaska 2013).

For purposes of argument we assume, as the superior court apparently did,[5] that the arbitration provision in the Jacobs's contract with DSI "flowed down" and by flowing down governed the relationship between Jacobs and GeoTek as well.

### 1. Whether Jacobs agreed to arbitrate the dispute was a question for the court, not the arbitrator.

The Federal Arbitration Act[6] and Alaska's Uniform and Revised Uniform Arbitration Acts[7] all reflect "a strong policy in favor of the arbitration of disputes."[8] Like federal law, Alaska's statutes provide that "[a]n arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled."[9] Alaska's statutes also provide, however, that "[t]he court shall decide whether an agreement to arbitrate exists or a

---

[5]    At oral argument on Jacobs's first motion for summary judgment, the superior court asked counsel for Jacobs whether it was "Jacobs's position that even if there was a flow-down, a forcible flow-down provision, . . . that it doesn't really matter, because within 30 days they have the sole right to accept or reject[,] [a]nd, in this case, they unequivocally rejected the arbitration." The court later asked counsel for GeoTek whether it was his "position that even if there was an assignment or a flow down, that doesn't change the terms of the arbitration clause . . . that Jacobs would still have the right to arbitrate or not, at their discretion." Both counsel agreed with the court's characterizations of their clients' positions.

[6]    9 U.S.C. § 1 et seq. (2012).

[7]    AS 09.43.010 – .180 (Uniform Arbitration Act); AS 09.43.300 – .595 (Revised Uniform Arbitration Act).

[8]    *Gibson v. Nye Frontier Ford, Inc.*, 205 P.3d 1091, 1096 (Alaska 2009).

[9]    AS 09.43.330(d); *see BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1207 (2014) (citations omitted) (explaining that "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration").

controversy is subject to an agreement to arbitrate,"[10] mirroring federal law "that courts are the proper forum to determine whether a dispute is arbitrable."[11] "One reason for this division of authority is [that] [b]ecause arbitrators have such broad discretion, it is often problematic for them to decide their own jurisdiction, for if they are wrong, there may be essentially no review" because of the "extreme deference [that a court will give] to the arbitrator."[12]

The first question we must answer in this case, therefore, is whether Jacobs's consent was necessary before a particular dispute could be "subject to [the] agreement to arbitrate" — in which case the issue is one of arbitrability under AS 09.43.330(c), and the question of consent was for the superior court to decide; or, on the other hand, whether Jacobs's consent was "a condition precedent to arbitrability" — in which case the question of consent was up to the arbitrator under AS 09.43.330(d). The United States Supreme Court recently described this dichotomy in terms of "presumptions" that help courts determine parties' intent "if the contract is silent on the matter of who primarily is to decide 'threshold' questions about arbitration."[13] According to the Court, parties are presumed to intend that courts will decide "arbitrability" issues "such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a

---

[10]     AS 09.43.330(c).

[11]     *Lexington Mktg. Grp., Inc. v. Goldbelt Eagle, LLC*, 157 P.3d 470, 477 (Alaska 2007).

[12]     *Classified Emps. Ass'n v. Matanuska-Susitna Borough Sch. Dist.*, 204 P.3d 347, 353 (Alaska 2009) (quoting *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks*, 48 P.3d 1165, 1169 (Alaska 2002)) (internal quotation marks omitted).

[13]     *BG Grp., PLC*, 134 S. Ct. at 1206.

particular type of controversy.' "[14] On the other hand, parties are presumed to intend that arbitrators will decide disputes about "particular procedural preconditions for the use of arbitration," which may include whether "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate" have been satisfied.[15]

We recognize that some conditions precedent can readily be recharacterized as questions of arbitrability; a party could argue, for example, that it has agreed to arbitrate only those disputes that are submitted to arbitration by a certain time, or on a certain form, or at a certain address — raising issues of "arbitrability" that clearly hinge on the determination of what are actually procedural preconditions. For a cogent explanation of how to differentiate the two, Jacobs directs us to *Rockland County v. Primiano Construction Co.*[16] In that case the Court of Appeals of New York, recognizing that "[w]hether the particular requirement falls within the jurisdiction of the courts or of the arbitrators" could be reduced to a game of semantics, explained that the real difference "depends on [the requirement's] substance and the function it is properly perceived as playing — whether it is in essence a prerequisite to entry into the arbitration process or a procedural prescription for the management of that process."[17] The court noted that the parties, by contract, "may have erected a prerequisite to the submission of any dispute to arbitration, in effect a precondition to access to the arbitral forum," and

---

[14] *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).

[15] *Id.* at 1206-07 (internal footnotes, citations, and internal quotation marks omitted).

[16] 409 N.E.2d 951 (N.Y. 1980).

[17] *Id.* at 954.

that "[i]n such event the reluctant party may be forced to arbitration only if the court determines that this portion of the agreement has been complied with."[18] It cited another case with parallels to this one: *Opan Realty Corp. v. Pedrone*, in which a partnership agreement stipulated that any dispute would be decided by the American Arbitration Association "but that a dispute shall not be determined to exist thereunder until the matter is first submitted for determination to the partnership," which could resolve the matter by an 80 percent vote.[19] The court in *Opan Realty* held that whether this condition had been fulfilled was "a question at least initially for the court, not the arbitrator."[20] And the court in *Rockland County* concluded: "Beyond that it is to be remembered that inasmuch as the entire arbitration process is a creature of contract, the parties by explicit provision of their agreement have the ability to place any particular requirement in one category or the other."[21]

The United States Supreme Court undertook a similar analysis in *Howsam v. Dean Witter Reynolds, Inc.*, in which it categorized all threshold questions as "gateway" questions that can be sorted into questions of arbitrability decided by the court and procedural questions decided by the arbitrator.[22] Like the court in *Rockland County*, the Supreme Court recognized that the semantic difficulty in drawing the boundary between the two types of gateway questions is best resolved by determining whether the

---

[18]     *Id.* (footnote omitted).

[19]     335 N.E.2d 854, 855 (N.Y. 1975).

[20]     *Id.*

[21]     409 N.E.2d at 955. Notably, the New York Court of Appeals used an earlier formulation of the relevant dichotomy, in which questions of arbitrability, rather than procedural preconditions, were termed "conditions precedent." *Id.* at 954-55.

[22]     537 U.S. 79, 83-85 (2002).

-10-                                                                      7031

particular question at issue is of a type that the parties would likely expect to be decided by an arbitrator or a judge:

> The Court has found the phrase ["question of arbitrability"] applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.
>
> . . . .
>
> At the same time the Court has found the phrase "question of arbitrability" *not* applicable in other kinds of general circumstance where the parties would likely expect that an arbitrator would decide the gateway matter. Thus " 'procedural' questions which grow out of the dispute and bear on its final disposition" are presumptively *not* for the judge, but for an arbitrator, to decide.[23]

Within this general framework we seek to determine what the parties to the Jacobs-DSI contract could reasonably have expected from the specific language they used to describe the arbitration option. We resolve ambiguities "in favor of arbitrability where such construction is not obviously contrary to the parties' intent."[24] But "[b]ecause arbitration is a creature of contract, parties can only be compelled to arbitrate a matter when they have agreed to do so."[25] "Accordingly, if a dispute is not, under a plausible interpretation, covered under the arbitration clause of a[n] . . . agreement, it

---

[23]    *Id.* at 83-84 (emphasis in original) (internal footnotes and citations omitted).

[24]    *Lexington Mktg. Grp., Inc. v. Goldbelt Eagle, LLC*, 157 P.3d 470, 476 (Alaska 2007) (quoting *Univ. of Alaska v. Modern Constr., Inc.*, 522 P.2d 1132, 1138 (Alaska 1974)).

[25]    *Id.* at 477.

should not be arbitrated because 'a party cannot be required to submit to arbitration any dispute which he had not agreed so to submit.' "[26] We are therefore required to vacate an arbitration award if we find that "there was not an agreement to arbitrate."[27]

The "Disputes on Claims" section of the Jacobs-DSI contract begins with the subcontractor's agreement "to first submit any claim or dispute arising under, related to or in connection with the Work, this Subcontract, or the Project, to Company in writing prior to initiating any legal or other dispute procedure."  A few paragraphs later the arbitration provision reads, in relevant part:

> All claims, disputes and other matters in question between Subcontractor and Company arising out of or related to the Work, this Subcontract or the Project . . . shall, *at the sole option of the Company*, be decided by arbitration.  *In the event the Company elects to have the matter resolved through arbitration*, *then* at Company's direction, Subcontractor shall submit the matter to the American Arbitration Association for processing under the appropriate Industry Rules of the American Arbitration Association then in effect.  If a claim is made, or a demand for arbitration is filed, by Subcontractor, Company will advise Subcontractor within thirty 30 days [sic] after the receipt of such a demand for arbitration . . . , *if Company exercises the option to arbitrate or rejects arbitration; such election, once made, shall be binding.*[28]

We conclude that this provision is unambiguous.  The only claims Jacobs has agreed to arbitrate are those it elects, on a case-by-case basis, to have decided by arbitration.

---

[26]     *Classified Emps. Ass'n v. Matanuska-Susitna Borough Sch. Dist.*, 204 P.3d 347, 353 (Alaska 2009) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)).

[27]     AS 09.43.500(a)(5).

[28]     Emphasis added.

Arbitration of any claim will occur at Jacobs's "sole option," which Jacobs will exercise within 30 days of receiving a demand. Jacobs's election, once made, is binding. And it is only "[i]n the event [that] [Jacobs] elects to have the matter resolved through arbitration" that the matter will "then" be referred to the American Arbitration Association for processing under the AAA rules.

Jacobs's consent to arbitrate any particular dispute is not a mere procedural precondition to arbitrability, "such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate."[29] Jacobs agreed to arbitrate a limited category of disputes: those it identified, on a case-by-case basis, as disputes it was willing to submit to arbitration. The issue of Jacobs's consent therefore presented a question of arbitrability — "whether [the] controversy is subject to [the] agreement to arbitrate" — and was properly for the court to decide.[30]

> **2. The superior court correctly held that Jacobs did not agree to arbitrate GeoTek's claim.**

GeoTek apparently demanded arbitration on April 28, 2010.[31] Although it is not apparent from the record when Jacobs received GeoTek's demand, Jacobs responded on May 13, 2010, well within 30 days of the demand's date. Jacobs's response was unequivocal: "Jacobs rejects Geo Tek's demand for arbitration and recommends that Geo Tek pursue it[s] contractual rights and claims against its customer, [DSI]." Jacobs's response could not reasonably have been misunderstood. Its clear and

---

**29** *See BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1207 (2014) (internal quotation marks and citation omitted).

**30** AS 09.43.330(c).

**31** As noted above, Jacobs's response to the American Arbitration Association referenced the Association's May 5, 2010 letter and GeoTek's April 28, 2010 demand.

unequivocal decision *not* to arbitrate was, according to the contract, binding on the parties.

### 3. GeoTek's arguments are unpersuasive.

GeoTek contends that the requirement of Jacobs's consent to arbitration is not a determinant of arbitrability but rather a condition precedent to arbitration, like the others — time limits, notice, laches, and estoppel — that courts have left for the arbitrator's determination. GeoTek also asserts that the superior court "failed to engage in the limited arbitrability inquiry allowed under Alaska law" because the court's decision was not limited to whether the parties had an arbitration agreement or whether it covered the parties' dispute. GeoTek argues that "Jacobs's letter [rejecting arbitration] did not absolve it of any obligation to participate in the arbitration" because it was "necessary for Jacobs to participate in the arbitration to the extent it objected to the arbitrator's exercise of jurisdiction." Finally, GeoTek argues that even if Jacobs's rejection presented an issue of arbitrability, the superior court should not have addressed it because the parties had explicitly delegated arbitrability determinations to the arbitrator through their incorporation of the AAA Industry Rules.

As explained above, discerning the parties' intent is our paramount concern when we are deciding whether consent to arbitration presents a question of arbitrability or a procedural condition precedent.[32] We have repeatedly recognized that "[b]ecause arbitration is a matter of contract, parties can only be compelled to arbitrate a matter where they have agreed to do so."[33] Thus, "if there are terms in a contract that either exclude arbitration or indicate that an issue should not be subject to arbitration, then

---

[32] *Lexington Mktg. Grp., Inc. v. Goldbelt Eagle, LLC*, 157 P.3d 470, 478 (Alaska 2007) (providing for arbitration when it "is consistent with the parties' intent").

[33] *Id.* at 477.

requiring that the matter be sent to arbitration would be inappropriate."[34] In this case we are convinced that the plain language of the arbitration provision demonstrates the parties' intent that Jacobs decide unilaterally whether any given dispute will be arbitrated; that is, a dispute's arbitrability is determined by whether Jacobs agrees to arbitrate it. We respect the parties' choice of language. To adopt GeoTek's position instead would be to hold that a party that has bargained for the contractual right to avoid arbitration at its sole option must in fact arbitrate in order to vindicate that right — with no prospect of de novo judicial review.

GeoTek also argues that the parties' arbitration provision expressly provides that disputes shall be resolved according to "the appropriate Industry Rules of the American Arbitration Association" and that these rules give the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement."[35] We need not decide what the AAA Industry Rules would require in this case, because we disagree with GeoTek's assertion that they govern the procedure the parties have adopted for the initiation of arbitration.

The presumption that arbitrability is a question for the courts can only be rebutted if the parties have "clearly and unmistakably provide[d] otherwise."[36] The arbitration provision at issue here plainly states that a matter shall be "submitted to the American Arbitration Association for processing under the appropriate Industry Rules

---

[34]   *Classified Emps. Ass'n v. Matanuska-Susitna Borough Sch. Dist.*, 204 P.3d 347, 353 (Alaska 2009).

[35]   *See* Am. Arbitration Ass'n, Comm. Arbitration Rule 7(a) (2013).

[36]   *State v. Pub. Safety Emps. Ass'n*, 798 P.2d 1281, 1285 (Alaska 1990) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).

of the American Arbitration Association then in effect" only "[*i*]*n the event* [*Jacobs*] *elects to have the matter resolved through arbitration*;" if Jacobs so elects, "*then*" the matter will be submitted to the AAA "at [Jacobs's] direction."[37]  Under the contract's explicit language, the AAA rules come into play only after Jacobs has agreed to submit a claim to arbitration — which in this case it refused to do.[38]  The parties did not "clearly and unmistakably" provide that the arbitrator determine questions of arbitrability, but rather the opposite.[39]

## B. The Superior Court Did Not Err In Granting Summary Judgment To Jacobs On GeoTek's Negligence Claims.

GeoTek also appeals from the superior court's grant of summary judgment to Jacobs on GeoTek's negligence claims.  GeoTek alleged in its amended complaint that Jacobs was responsible for DSI's payments to GeoTek because of Jacobs's negligent failure (1) to require DSI to post a performance bond to ensure the payment of its subcontractors, as required by Jacobs's form contract; (2) to follow the provisions of its proposed risk management plan regarding a 15 percent retainage and signed releases from DSI's second-tier subcontractors; and (3) to inform GeoTek that it had not taken these steps.  The superior court found no support in the contract, in statutes, or in the

---

[37]    Emphasis added.

[38]    *See Opan Realty Corp. v. Pedrone*, 335 N.E.2d 854, 855 (N.Y. 1975) (holding that where partnership agreement stated that any dispute would be decided by the American Arbitration Association but must first be submitted to the partnership for consideration, whether this precondition had been satisfied was a matter for the court).

[39]    We necessarily reject GeoTek's additional argument that the claims assigned to it by DSI were separately arbitrable.  Arbitrability depended on Jacobs's election to arbitrate, which it never made with regard to any of the claims at issue, whether direct or assigned.

common law for the imposition of a negligence duty on Jacobs. We conclude that the superior court did not err.

> **1.** **The superior court correctly held that Jacobs did not have an extra-contractual duty to protect GeoTek against the risk of nonpayment by DSI.**

To determine whether a defendant owes a plaintiff a duty of reasonable care, "we first determine whether a duty is imposed by statute, regulation, contract, undertaking, the parties' preexisting relationship, or existing case law."[40] "If these sources do not resolve the issue, we apply the multi-factor approach discussed in *D.S.W.* . . . to determine whether an actionable duty exists."[41] The so-called "*D.S.W.* factors" are seven public policy considerations we use to determine whether we should recognize a negligence duty not otherwise defined by law.[42]

---

[40] *McGrew v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 106 P.3d 319, 322 (Alaska 2005) (footnote omitted).

[41] *Id.* (citing *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981)).

[42] The *D.S.W.* factors are:

> The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*D.S.W.*, 628 P.2d at 555 (quoting *Peter W. v. San Francisco Unified Sch. Dist.*, 131 Cal. Rptr. 854, 859-60 (Cal. App. 1976)).

For its imposition of a duty in this case, GeoTek relies on *Mattingly v. Sheldon Jackson College*.[43] In *Mattingly* we held that "a defendant owes a duty of care to take reasonable measures to avoid the risk of causing economic damages, aside from physical injury [or property damage], to particular plaintiffs or plaintiffs comprising an identifiable class [of persons who] defendant knows or has reason to know are likely to suffer such damages from its conduct."[44] GeoTek contends that "[i]n accord with *Mattingly*, . . . Jacobs's awareness of GeoTek combined with its knowledge that GeoTek could suffer [the] economic harm of not being paid by DSI is what gave rise to a duty."

But GeoTek misinterprets our holding in *Mattingly*. *Mattingly* did not create a new duty in tort, let alone one so broad as to provide a negligence cause of action for any foreseeable economic harm caused by another's lack of due care. *Mattingly* simply expanded liability in tort to include purely economic losses; this marked a significant departure from the long-standing "virtually *per se* rule barring recovery for economic loss unless the negligent conduct also caused physical harm."[45]

After *Mattingly* we have never held that foreseeable economic harm to an identifiable plaintiff is all that is required to establish a duty of care.[46] For example, in *Mesiar v. Heckman* we considered whether the Alaska Department of Fish and Game

---

[43]     743 P.2d 356 (Alaska 1987).

[44]     *Id.* at 360 (quoting *People Express Airlines, Inc. v. Consol. Rail Corp.*, 495 A.2d 107, 116 (N.J. 1985)) (first alteration in *Mattingly*; second alteration added).

[45]     *Id.* at 359 (quoting *People Express*, 495 A.2d at 109).

[46]     A federal court recognized this in *U.S. ex rel. N. Star Terminal & Stevedore Co. v. Nugget Constr., Inc.*, 445 F. Supp. 2d 1063, 1076 n.42 (D. Alaska 2006) ("*Mattingly* . . . stands for the proposition that a party that is only economically injured can nonetheless sue for negligence, *so long as a duty exists*. It defines the parameters of an existing duty and does not, as Plaintiffs imply, impose a new duty where there otherwise would be none.") (emphasis added).

could be liable on claims it had negligently miscounted a salmon run, thereby causing unnecessary restrictions on certain Yukon River fisheries and economic harm to the plaintiffs.[47] To determine whether "an actionable duty of care exist[ed]" we turned to the *D.S.W.* factors.[48] In our discussion of the first *D.S.W.* factor — the foreseeability of harm — we cited *Mattingly* for the proposition that "for purely economic harm, the identifiable class of plaintiffs must be particularly foreseeable in number, type, and economic expectations."[49] We agreed with the plaintiffs that the Department's "closure decisions predictably and specifically harmed users [including the plaintiffs]."[50] But noting that any fisheries-management action that harms one user group may favor others, we concluded that "the foreseeability of harm to [the plaintiffs] is not a dispositive factor" in determining the existence of a tort duty and went on to weigh the remaining *D.S.W.* factors.[51] We ultimately concluded that the Department owed no actionable duty to the plaintiffs — a conclusion we would not have reached if all that is required under *Mattingly* for a duty to exist is the foreseeability of economic harm to an identifiable plaintiff.[52]

---

[47]    964 P.2d 445, 448-49 (Alaska 1998).

[48]    *Id.* at 450 (citing *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981)).

[49]    *Id.*

[50]    *Id.*

[51]    *Id.*

[52]    *Id.* at 452; *see also Lynden Inc. v. Walker*, 30 P.3d 609, 614 (Alaska 2001) (summarizing *Mesiar* and noting that in that case, "[d]espite the foreseeability of economic injury to fishermen if data was improperly collected, we found that [other *D.S.W.*] factors argued against imposing a duty").

We followed the same course in *Stephens v. State, Department of Revenue*, decided just a few months after *Mattingly*.[53] A taxpayer sued the State, alleging that the Department of Revenue had negligently and maliciously attempted to collect on a judgment for unpaid taxes after the debt had been discharged in bankruptcy.[54] To determine "whether the defendant owed the plaintiff a duty of care under the circumstances," we reviewed the *D.S.W.* factors.[55] We observed initially that "[i]nnocent defendants or those not liable to a plaintiff will foreseeably suffer harm as a direct result of a negligently brought prosecution or lawsuit," but again the foreseeability of economic harm to an identifiable plaintiff was not sufficient to establish a duty: we analyzed the remaining public policy considerations from *D.S.W.* and concluded that no duty existed.[56]

Notably, the New Jersey case we followed in *Mattingly*, *People Express Airlines v. Consolidated Rail Corp.*,[57] recognized the limits of looking to foreseeability alone to determine whether a duty in tort exists. Reflecting our own reliance on public policy concerns as identified in *D.S.W.*, the New Jersey Supreme Court in *People Express* observed that courts "will be required to draw upon notions of fairness, common sense and morality to fix the line limiting liability as a matter of public policy, rather than an uncritical application of particular foreseeability."[58] New Jersey courts since *People*

---

[53]    746 P.2d 908 (Alaska 1987).

[54]    *Id.* at 909.

[55]    *Id.* at 910.

[56]    *Id.* at 911.

[57]    495 A.2d 107 (N.J. 1985).

[58]    *Id.* at 116.

*Express* have held that foreseeability alone is insufficient to show the existence of a duty in a negligence case claiming economic harm.[59]

In sum, while we have labeled foreseeability "the single most important criterion for imposing a duty of care,"[60] it is clear that Alaska's courts must still consider the full panoply of *D.S.W.* factors when deciding whether an actionable duty of care exists. We reject GeoTek's argument that, under *Mattingly*, Jacobs's knowledge of DSI's financial situation and its knowledge that GeoTek would be harmed if DSI did not pay its subcontractors would be enough, without more, to establish a duty of care actionable in tort.[61]

---

[59]    *See, e.g.*, *Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc.*, 638 A.2d 1288, 1294 (N.J. 1994) ("Ability to foresee injury to a potential plaintiff does not in itself establish the existence of a duty . . . . Once the foreseeability of an injured party is established, we must decide whether considerations of fairness and policy warrant the imposition of a duty." (citations omitted)).

[60]    *R.E. v. State*, 878 P.2d 1341, 1346 (Alaska 1994); *see also State v. Sandsness*, 72 P.3d 299, 305-06 (Alaska 2003) ("While the most important single *D.S.W.* factor is foreseeability," it is not dispositive.).

[61]    GeoTek also contends that, independent of *Mattingly*, Jacobs's development of a risk management plan was a voluntary undertaking that extended its liability beyond what was otherwise required by law, citing *Guerrero v. Alaska Hous. Fin. Corp.*, 6 P.3d 250, 258 (Alaska 2000). GeoTek does not develop this argument further. In *Guerrero* we reviewed the dismissal of a complaint under the lenient standards of Alaska Civil Rule 12(b)(6) and held that the allegations of the complaint did not necessarily rule out the possibility that the defendant landlord had voluntarily expanded the scope of its duty of care. But we noted that "our ruling on the impropriety of a dismissal under Rule 12(b)(6) does not necessarily preclude the superior court from deciding disputed issues of duty on summary judgment," *id.* at 258 n.33, as happened in this case.

## 2. GeoTek does not identify other *D.S.W.* factors that could support the recognition of a duty in this case.

"In the absence of any other source of a duty of care," we weigh the seven *D.S.W.* factors to determine whether a common law duty of care exists.[62] Hinging its argument on foreseeability alone under *Mattingly*, GeoTek does not address the other *D.S.W.* factors. The superior court did not address them either, finding that the question of duty was controlled by our decision in *Municipality of Anchorage v. Tatco, Inc.*[63] The plaintiffs in *Tatco* had supplied materials to the contractor on a municipal landfill project.[64] When the contractor failed to pay, the suppliers sued the Municipality for its failure to require the contractor to post a payment bond or to certify, before being paid, that it had paid all its laborers and suppliers.[65] We held that the Municipality was entitled to summary judgment because a payment bond for the benefit of subcontractors was not required either by statute[66] or by the contract between the Municipality and the contractor.[67] We do not consider *Tatco* controlling in this case, however, as the suppliers

---

[62]     *See Parnell v. Peak Oilfield Serv. Co.*, 174 P.3d 757, 767 (Alaska 2007) (quoting *Bolieu v. Sisters of Providence in Wa.*, 953 P.2d 1233, 1235 (Alaska 1998)) (internal quotation marks omitted).

[63]     774 P.2d 207 (Alaska 1989).

[64]     *Id.* at 208.

[65]     *Id.*

[66]     We determined that the contract at issue was not covered by the "Little Miller Act," AS 36.25.010 – .025, and specifically its requirement that public entities require public-works contractors to post bonds for the payment of laborers and suppliers, AS 36.25.010(a). *Id.* at 211.

[67]     *Id.* at 210-12.

in *Tatco* apparently did not ask the court to decide whether the Municipality had breached a duty in tort independent of statute and contract.

Because GeoTek does not analyze the *D.S.W.* factors in its briefing before us, we need not decide whether they require us to recognize an actionable duty in tort.[68] We do note, however, that most factors militate against it. First, as contrasted to negligence creating a risk of death or physical injury, "we have ascribed little blameworthiness to ordinary negligence that merely causes economic . . . harm."[69] This is particularly true when parties are in a position to have contracted around the risk; GeoTek's injury would not have occurred absent its own decision to enter into a contract with DSI, knowing, as it did, that DSI had failed to secure bonding. The policy of preventing future harm also does not require recognition of a novel duty in tort, as other contracting parties have the ability to protect themselves either by refusing to enter into relationships they consider financially fraught or by negotiating for more protective provisions in their contracts before signing them.[70] Imposing a duty in cases like this one would subject contractors to the added burden of protecting the purely economic interests of parties with whom they have no privity;[71] it would also enhance their risk of having

---

[68] *See Glover v. Ranney*, 314 P.3d 535, 545 (Alaska 2013) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.") (internal quotation marks omitted).

[69] *See Mesiar v. Heckman*, 964 P.2d 445, 451 (Alaska 1998).

[70] *See Alaska Pac. Assurance Co. v. Collins*, 794 P.2d 936, 946 (Alaska 1990) (noting that "[p]romises set forth in a contract must be enforced by an action on that contract").

[71] *See Imperial Mfg. Ice Cold Coolers, Inc. v. Shannon*, 101 P.3d 627, 630 (Alaska 2004) (explaining that the Little Miller Act is based on the premise that the government cannot "be charged by those with whom the government has no contractual

(continued...)

to pay twice for the same labor or materials.[72]  And finally, GeoTek does not provide public-policy support from other jurisdictions; it does not cite any cases in which courts imposed an extra-contractual duty on contractors to answer for the debts of their subcontractors in circumstances like those presented here.

## V.    CONCLUSION

The superior court's grants of summary judgment are AFFIRMED.[73]

---

[71](...continued)
relationship").

[72]    *See id.* (holding that the Little Miller Act does not provide a private negligence cause of action against a government entity for its failure to require a payment bond in part because "if the legislature had intended to impose government liability — in effect . . . to require public entities 'to pay twice for a public project' — this intention would have been expressed because it is a significant variation from the existing norm").

[73]    Because we affirm the superior court's judgment, we necessarily reject GeoTek's argument that it should be considered the prevailing party for purposes of an attorney's fees award.